**Stephen J. FAHERTY, Sr., Plaintiff,**

v.

**James B. LOCKHART, Defendant.**

**Civ. A. No. 89–1319.**

United States District Court,
District of Columbia.

Sept. 27, 1990.

William Branford, Neill, Mullenholz & Shaw, Washington, D.C., for plaintiff.

William J. Dempster and Marina Utgoff Braswell, Asst. U.S. Attys., Washington, D.C., for defendant.

### MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Plaintiff Steven J. Faherty, Sr. brought this action against defendant James B. Lockhart in his official capacity as the Executive Director of the Pension Benefit Guaranty Corporation (hereinafter "PBGC" or "the agency") alleging that he was the victim of age and sex discrimination and of retaliation for participating in the Equal Employment Opportunity process. Mr. Faherty's amended complaint is in three counts. Count I alleges that Mr. Faherty was discriminated against on the basis of his age in May 1987, in contravention of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 633a, *et seq.*, when Kathleen Utgoff (PBGC's Executive Director at that time) did not select him for the position of career Deputy Executive Director for Management and Operations (hereinafter "DED position"). Count I also alleges that Dr. Utgoff engaged in a continuing pattern and practice of discrimina-

tion against career high level managers and executives over 40 years of age. Count II of the amended complaint alleges that Mr. Faherty was denied an executive parking space in January 1989, in retaliation for filing an EEO complaint regarding the selection for the DED position, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 *et seq.* Mr. Faherty further alleges in Count II that he was discriminated against on the basis of his age, in violation of the ADEA, and on the basis of his sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, when the new parking policy was implemented by PBGC. Count III of the amended complaint alleges that Mr. Faherty was the victim of age and sex discrimination and of retaliation in April 1989, when he was not selected for the GS–16 position of Director, Information Resources Management Operation Department (hereinafter "IRMD position").

The Court finds, after six days of trial, that Mr. Faherty failed to prove any of his claims of discrimination or retaliation, and that defendant is entitled to judgment.

## I. FINDINGS OF FACT

Mr. Faherty is currently employed as a GS–340–16, Program Manager, in the position of Deputy Director of the Insurance Operations Department at the Pension Benefit Guaranty Corporation. He has held this position since May 1986.

Mr. Faherty is a male, who was born on January 7, 1940. At all times relevant to this case, Mr. Faherty was over 40 years of age.

At all times relevant to this case, Dr. Kathleen Utgoff was the Executive Director of the PBGC. Dr. Utgoff was appointed to the position of Executive Director of the PBGC effective August 12, 1985, and served in that capacity until June 26, 1989. The Executive Director of the PBGC is a non-career position, obtained through a political appointment. Dr. Utgoff, a female, was born on February 5, 1948.

The PBGC is a United States Corporation created by Title IV of the Employee Retire-ment Income Security Act of 1974, *as amended,* 29 U.S.C. §§ 1301–1461 ("ERISA"). The PBGC guarantees the payment of certain pension benefits when pension plans covered by Title IV terminate. *See* ERISA §§ 4021, 4022; 29 U.S.C. §§ 1321, 1322.

Within PBGC, the Office of the Executive Director ("OED") oversees all other departments.

When Dr. Utgoff arrived at the PBGC, it was experiencing severe problems in the areas of budget and computers. The agency was running a deficit of approximately $100 million to $200 million a month, brought on by a number of complicated factors, including inadequate legislation and increased pension plan terminations. Additionally, the computer capacity was such that Dr. Utgoff was unable to obtain various pieces of important information regarding the status of accounts at the agency, including such information as the number of pensioners the PBGC was paying or the amount of premiums it was collecting at any given time.

Dr. Utgoff decided that her primary focus as Executive Director should be working on legislation to raise PBGC's premium structure and to amend the broad ERISA provisions which permitted companies to terminate their plans, effectively leaving PBGC with huge pension obligations.

Given that she would be spending inordinate amounts of time trying to persuade both Congress and the White House to support her legislative initiatives, Dr. Utgoff decided it was important that PBGC be perceived as a well-run agency. Dr. Utgoff obtained the help of Mr. Steve Lorch, an expert management consultant, to advise her on the operational problems of the agency. Based on his recommendation, Dr. Utgoff decided that the PBGC was in immediate need of a Deputy to manage the day-to-day operations of the agency, to be the arbiter of in-house turf battles, and guide the agency to a resolution of its two most pressing internal problems: the budget and computers.

Based on a recommendation he had received from Colin Blayden the Dean of the business school at Dartmouth College, Mr. Lorch suggested that Dr. Utgoff contact Joseph Vasquez, who appeared to be someone who could help PBGC with the problems it was facing.

At that time, Mr. Vasquez was working at the Office of Management and Budget ("OMB") as a SES–4 Chief of the Central Budget Management Staff. Mr. Vasquez was known for his highly successful design and implementation of the OMB computer system program used to manage the Gramm–Rudman budget requirements for the United States. Although not his primary responsibility, Mr. Vasquez was also involved in OMB's consideration of pension issues related to then pending pension legislation in the Congress, particularly the premium rate legislation. Mr. Vasquez, a male, was born on October 19, 1950.

Mr. Vasquez had been the recipient of many honors and awards, including a citation by the President of the United States in June 1986, for his "outstanding accomplishments."[1] This citation was one of approximately six to ten made by the President during that year.[2] In 1987, Mr. Vasquez was nominated by OMB for an Achievement Award in Managing Information Technology.[3] Mr. Vasquez received "outstanding" performance ratings at OMB during 1983, 1984, and 1985. Additionally, he received cash awards in the amounts of $10,000, $10,000, and $6,500 in those years, respectively.

In his position at OMB, Mr. Vasquez supervised a small staff of professionals and contractors in the operation of a budget data base and supervised executive budget exercises for professionals not on his immediate staff. Before he worked at OMB, he was employed in the private sector, where he gained supervisory and finance experience, as well as some experience on pension issues.

In November or December, 1986, Dr. Utgoff arranged to meet with Mr. Vasquez over lunch. Prior to this meeting, Mr. Vasquez did not know Dr. Utgoff, or any other official at the PBGC. Dr. Utgoff testified that she asked Mr. Vasquez to have lunch to discuss budget problems at PBGC. Dr. Utgoff did not offer Mr. Vasquez a position at the PBGC, nor did she make Mr. Vasquez any promises. The conversation focused primarily on the budget and computer problems currently being experienced at PBGC, and whether these problems were of the kind to interest Mr. Vasquez. The lunch was clearly an opportunity for Dr. Utgoff to feel Mr. Vasquez out as to his interest in working at a place like PBGC, and an opportunity for Mr. Vasquez to determine what PBGC did, and how someone with his kind of background could be used at the PBGC.

Sometime after the meeting, Dr. Utgoff asked Mr. Royal Dellinger to meet with Mr. Vasquez. Mr. Dellinger, a political appointee, was the PBGC's chief negotiator on legislative initiatives. Mr. Dellinger was born on September 26, 1949.

Mr. Vasquez and Mr. Dellinger met in November or December 1986. Mr. Dellinger did not offer Mr. Vasquez a job during this meeting. Following the meeting, Mr. Dellinger reported to Dr. Utgoff that he found Mr. Vasquez to be someone with whom he could work.

Having formed a favorable impression of Mr. Vasquez, and having received a positive reaction from Mr. Dellinger, Dr. Ut-

---

**1.** The citation said in part, "You have set a shining example for others by demonstrating that Federal employees can make the critical difference in how well Government meets the needs of the Nation." Defendant's Exhibit 13.

**2.** In the nomination of Mr. Vasquez for the Presidential Management Improvement Award, the Director of OMB stated that "Mr. Vasquez has developed a large, complex, and flexible decision-support system, which has made available to policy makers for the first time a large variety of policy options. He has also provided creative leadership in the application of new automated systems to the budget decisionmaking process." Defendant's Exhibit 13.

**3.** The nomination stated that Mr. Vasquez "... conceptualized and implemented a large scale project that enhanced the Presidential level decision-making capabilities and planning, restored OMB's ADP capabilities, and provided new capabilities." Defendant's Exhibit 13.

goff decided that Mr. Vasquez would make a good addition to her troubled agency. She talked with Frank Tobin, PBGC's Personnel Director, to discuss ways in which Mr. Vasquez could be brought over to the PBGC. Mr. Tobin, a male was born on June 15, 1938. He suggested that the quickest way for Mr. Vasquez to come to PBGC would be through a non-career political appointment, which would require White House concurrence.

At Dr. Utgoff's request, Mr. Tobin began to prepare a package for submission to the White House Personnel Office proposing Mr. Vasquez for a non-career executive assignment. In December 1986, Mr. Vasquez met with Mr. Tobin to discuss whether Mr. Vasquez would be interested in coming to the PBGC as a political employee. During that meeting, Mr. Tobin asked Mr. Vasquez if he had any political credentials that would assist him in obtaining White House approval for a political appointment. Mr. Vasquez indicated that he had none. Ultimately, the political appointment route was not successful, despite efforts made by PBGC's personnel office and Royal Dellinger to encourage the White House to approve the appointment.

During the fall, and during the time that Mr. Vasquez was meeting with Dr. Utgoff, Mr. Dellinger and Mr. Tobin were in the process of preparing a draft position description for a new Deputy Executive Director for Management and Operations. In the past, the DED position had been filled by a political appointee, the most recent having been Kevin Putt.

During the preparation of the position description, Mr. Tobin suggested to Dr. Utgoff that both Mr. Vasquez and Mr. Dellinger review the draft position description. At the time, she and Mr. Tobin both realized that the responsibilities that would possibly be assigned to Mr. Vasquez, if his political appointment was approved, would dovetail with those of Mr. Dellinger. Given the organizational changes anticipated at PBGC, particularly with regard to the focus on the pressing problems of budget and computers, Dr. Utgoff felt it was appropriate to circulate drafts of the position description for comment. Mr. Vasquez reviewed the draft position description during the time that efforts were made to obtain White House approval for a political appointment.

Mr. Vasquez reviewed the draft position description, recommended some additions, and returned it to the agency. Plaintiff's Exhibit 4.[4] The changes that he made amounted to six inserts, which the Court finds were not "OMB sensitive," or targeted specifically to someone with only Mr. Vasquez's credentials. The additions dealt with broad managerial functions and with budget and computer matters, which many potential employees might have been able to meet. The OMB circulars cited in the

---

4. The additions made by Mr. Vasquez were as follows:

A. Reviews proposed policies, procedures and regulations prior to final approval and reports to the ED and DED for ? on the operational impact and makes a recommendation concerning the viability and efficacy of the proposals.

B. Directs the implimentation [sic] and completion of policy development projects/initiatives in conjunction with the requirements established by the ED and DED for ?. Ensures that the taking of internal resources requested by the DED for ? necessary to address legislative and policy development activities is accomplished and consistent with and does not conflict with the corporation's overall operation objectives.

C. In coordination with the DED for ? and consistent with the corporate [sic] objectives may act as liaison with private concerns, courts, and other government entities on issues relative to pension plan termination cases. May assist the ED and DED on matters of policy and legislation and undertake tasks in support of their efforts and the overall corporate objectives.

D. Is responsible for coordination the preparation of and presenting [sic] the PBGC budget under OMB Circular A–11; the PBGC financial and reporting process under OMB Circular A–34, A–112 and A–123; assigns responsibility for OMB issuances.

E. Working with the ED and DED for ?, develops and overseas [sic] operating strategies and objectives for the management of corporate financial assets.

F. Acts as the corporation Information Resources Official or delegates these responsibilities as defined in OMB Circular A–130. Overseas [sic] the corporations [sic] program under OMB Circular A–76.

Plaintiff's Exhibit 4.

additions made by Mr. Vasquez had governmental-wide applicability, were applicable to the PBGC, and were commonly known to and applied by high level executives in governmental agencies. Indeed, Mr. Faherty testified that he was familiar with the circulars himself.

Mr. Dellinger also reviewed the draft position description, but made no changes. Mr. Vasquez's recommendations were ultimately accepted by Dr. Utgoff, and incorporated into the position description which was submitted to the White House during the efforts to obtain approval for a political appointment.

When the White House indicated that Mr. Vasquez's political appointment would not be approved because of his insufficient political credentials, Mr. Tobin informed Dr. Utgoff that the only way to fill the position of DED was through the competitive selection process. Mr. Tobin submitted a draft vacancy announcement to Dr. Utgoff around December 19, 1986.

Given the pressing problems of the agency, Dr. Utgoff felt there was an immediate need for someone to handle the day-to-day functions of the agency. Mr. Tobin suggested that Mr. Vasquez might be interested in a temporary detail at the PBGC, until someone could be selected through the competitive selection process for the DED position.

Dr. Utgoff contacted Mr. Vasquez to find out if he would be interested in coming to the PBGC on an inter-agency detail. Mr. Vasquez stated that he would be so interested. At no time did Dr. Utgoff ever promise Mr. Vasquez a permanent position. In fact, both she and Mr. Vasquez testified that Dr. Utgoff made clear that the DED position would be filled through competitive selection, and that Mr. Vasquez was not guaranteed the position. Mr. Vasquez had reached the decision that he was ready

to leave OMB, regardless of what PBGC could offer him. He testified that during the time in which he was talking with officials at the PBGC, he was looking into other opportunities, and was using the services of a head hunter. Thus, there is no basis for the charge that merely because Mr. Vasquez had no plans to return to OMB, he believed he was guaranteed a permanent position at PBGC. All of his actions indicate that, having made the decision to leave OMB, Mr. Vasquez was willing to consider a temporary detail at the PBGC, that might work out into something more permanent. If the PBGC did not work out, he had already made other job inquiries and was prepared to continue in his job search. Mr. Vasquez accepted the inter-agency detail offered to him by Dr. Utgoff, and reported to PBGC on January 13, 1987. There is no requirement that an inter-agency detail position be competed.

On January 13, 1987, Dr. Utgoff issued a memorandum announcing the reorganization of the Office of the Executive Director. *See* Plaintiff's Exhibit 10. The reorganization included the establishment of a non-career DED position, responsible for assisting her with policy and legislative matters and serving as the chief negotiator on plan termination, and a career DED position for Management and Operations, responsible for the day-to-day operations of the agency. Dr. Utgoff announced that Mr. Dellinger would fill the non-career DED position, and that Mr. Vasquez would be detailed to the PBGC in the career DED position until it could be filled competitively. There was no indication that Mr. Vasquez was guaranteed the position permanently.[5]

In preparation for the competitive selection for the position of career DED, the Personnel Office prepared two identical vacancy announcements. Vacancy announce-

---

**5.** In the memorandum announcing the reorganization, Dr. Utgoff stated:

There will be a Career Deputy Executive Director for Management and Operations who will be responsible for the day-to-day operations of all the Corporation's Departments similar to the Chief Operating Officer in many private sector corporations. We have begun

the recruitment process to fill this position. We expect to make a permanent selection in 90–120 days. *Until a permanent selection is made,* Joseph A. Vasquez, Jr., Chief, Central Budget Management Staff, Office of Management and Budget, will be detailed to the Corporation and act in this position.
Plaintiff's Exhibit 10 (emphasis added).

ment # 87–22 applied to status candidates (those with government career tenure and reinstatement eligibility). Vacancy announcement # 87–23 applied to all candidates. Def. Exhibits 11 and 12. The duties of the DED were identified on the vacancy announcement as follows:

1. As Chief Operating Officer of PBGC, incumbent exercises direct control over the day-to-day operations of all Corporation's Departments.

2. Directs the implementation and completion of policy development, projects/initiatives in conjunction with the requirements established by the Executive Director and Principal Deputy Executive Director.

3. Acts as the Corporation's Information Resources Management Official or delegates these responsibilities under OMB Circular A–130.

4. Establishes standards of performance for and evaluates performance of Department Directors as well as oversees the performance appraisal and review process for personnel throughout the Corporation.

5. Coordinates the preparation of and presents the PBGC budget under OMB Circular A–11; the PBGC financial and reporting process under OMB Circulars A–34, A–112, and A–123.

Defendant's Exhibits 11 and 12. Mr. Vasquez did not review or comment on the vacancy announcement, or the rating plan used for evaluating applicants for the position.

The vacancy announcements were open for application for 30 days, from January 21, 1987, to February 20, 1987. On February 25, 1987, Dr. Utgoff selected the rating and ranking panel for the DED position. The panel consisted of three people: William DeHarde (the Director of PBGC's Insurance Operations Department and Mr. Faherty's immediate supervisor), Gary Ford (the General Counsel of PBGC), and John Seal (a SES official of the Equal Employment Opportunity Commission). Mr.

DeHarde had served as Mr. Faherty's supervisor and had consistently given Mr. Faherty high reviews. Both Mr. DeHarde and Mr. Ford were GS–17s.

Mr. Seal was designated by the panel to be its chairperson. He forwarded a copy of the proposed rating plan to Dr. Utgoff on March 19, 1987, for her approval. The Personnel Office had proposed the quality ranking factors by which the applicants' qualifications were to be evaluated and ranked by the rating panel. On March 25, 1987, Dr. Utgoff approved the rating plan, and gave Mr. Tobin the responsibility for determining the weights to be assigned the quality ranking factors. Defendant's Exhibit 8.

There were 16 applicants for the DED position under the two vacancy announcements. Of the 16 applicants, 12 were over 40 years of age. The rating panel rated the applications of the 16 applicants based on the factors in the rating plan. The rating panel forwarded two certificates of eligible applicants (one for each vacancy announcement) to Dr. Utgoff, who was the selecting official. Both Mr. Faherty and Mr. Vasquez applied for the DED position under the vacancy announcement # 87–23. The panel certified that the three most qualified applicants for vacancy announcement # 87–23 were Mr. Faherty, Mr. Vasquez, and Kenneth Pusateri. Only Mr. Faherty was over 40 years of age.

Mr. DeHarde gave the following ratings to the three most qualified applicants under vacancy announcement # 87–23: Mr. Pusateri—91; Mr. Faherty—88; Mr. Vasquez—86;[6] Mr. Seal gave the following ratings: Mr. Pusateri—91; Mr. Faherty—93; Mr. Vasquez—95;[7] Mr. Ford gave the following ratings: Mr. Pusateri—82; Mr. Faherty—87; Mr. Vasquez—92.[8] The average of these scores for each candidate was as follows: Mr. Pusateri—88; Mr. Faherty—89.3; Mr. Vasquez—91.[9]

---

6. Defendant's Exhibit 15.

7. Defendant's Exhibit 16.

8. Defendant's Exhibit 17.

9. Defendant's Exhibit 18.

In May 1987, Dr. Utgoff interviewed the three candidates certified by the rating panel under vacancy announcement # 87–23. She did not conduct interviews for any of the applicants certified as eligible under vacancy announcement # 87–22. Dr. Utgoff was not required to conduct any interviews at all.

Before Dr. Utgoff interviewed the applicants, Mr. Tobin suggested some general interview questions to her. Dr. Utgoff testified that she did not use all the same questions in each interview, since she felt some were inappropriate for particular candidates. For example, several of the prepared questions dealt with the applicant's general knowledge of the PBGC. Dr. Utgoff did not ask these questions of either Mr. Faherty or Mr. Vasquez, since both of them worked at the PBGC.

When Dr. Utgoff interviewed Mr. Faherty, she asked him about his involvement in the Jean Knight EEO case, a highly contested case that had demanded the agency's attention for years. Mr. Faherty had been named as an alleged discriminating official by Ms. Knight. The agency, after years of protracted litigation, decided to settle the case. Dr. Utgoff testified that when she asked Mr. Faherty questions on this topic, he was defensive and she changed the subject.

When Dr. Utgoff interviewed the other two candidates, Mr. Vasquez and Mr. Pusateri, she asked them questions regarding their involvement with EEO matters, including if they had ever been named as an alleged discriminating official.

Dr. Utgoff was not obligated by any law or regulation to use a standard list of prepared questions during her interview of the candidates, nor was there any obligation for her to deviate from a prepared list of questions. Further, there is no prohibition on asking an applicant for a supervisory level position about that person's prior handling of EEO matters. Indeed, such questions would likely be relevant when considering an applicant for a position that involves supervisory responsibilities over numerous employees.[10]

On May 12, 1987, Dr. Utgoff selected Mr. Vasquez for the DED position. Dr. Utgoff testified that she found Mr. Faherty's performance on "Project Computers" to be wanting, that his use of overly bureaucratic language was unilluminating, that she was concerned with his involvement in the Jean Knight EEO action, and his defensive reaction to her questions on this issue.

On November 6, 1987, Mr. Faherty filed a Notice of intent to file a civil action under the ADEA with the EEOC, pursuant to 29 U.S.C. § 633a(d), challenging his non-selection for the DED position.

Mr. Faherty alleges Mr. Vasquez's attendance at a meeting in March 1987 regarding the Senior Management Incentive Program ("SMIP") Cash Awards gave him an advantage in the competition for the DED position, because Mr. Vasquez could have made negative comments about Mr. Faherty. The Court rejects these allegations as unproven.

When Mr. Vasquez was serving in the DED position on detail, he attended a meeting. Among the other matters discussed at this meeting, attended by Dr. Utgoff, Mr. Tobin, and partially attended by Royal Dellinger, was the agency's annual awards under the SMIP. Mr. Vasquez had been present at the meeting for the other matters discussed, and when the topic changed to the SMIP awards, he stayed as an observer, not as a participant. No one recalled Mr. Vasquez making a single comment regarding who was an appropriate person to receive an award. In consultation with Mr. Tobin, Dr. Utgoff granted awards to three senior managers from among those eligible. All of the recipients were over 40 years of age. Both Mr. Faherty, and his immediate supervisor, Mr. DeHarde received awards.

---

**10.** The fact that Mr. Faherty was not the subject of formal disciplinary action as a result of his involvement in the Jean Knight affair is irrelevant. Nor does asking an applicant about his or her involvement in an EEO action, or factoring in such involvement in a decision about an applicant's qualifications for a position, constitute disciplinary action.

### The Parking Policy

Among the many issues brought to Dr. Utgoff's attention during her tenure at PBGC was its parking policy. During an interview of a job applicant, she learned that PBGC did not subsidize its employee parking costs at a level similar to other federal government agencies. Given her multitude of responsibilities as the head of a busy federal agency, Dr. Utgoff decided that the parking situation at PBGC was not something that demanded her personalized attention. Shortly after Mr. Vasquez was selected for the DED position, she delegated the parking issue to him.

Mr. Vasquez set out to compare PBGC's parking policy with those of other agencies. In June, 1987, long before Mr. Faherty's November 1987 notification of his intent to file a civil action regarding his non-selection for the DED position, Mr. Vasquez asked Robert Geiger (a male over the age of 40), who was the Director of PBGC's Human Resources and Support Services Department, to conduct a survey of policies and rates at other government agencies. Mr. Geiger's study, completed in July 1988, showed that many government employees working in the District of Columbia paid less for parking than PBGC employees, and that the criteria used for parking space allocation differed from agency to agency. In some agencies, allocation of parking spaces depended on an employee's job position, rather than an employee's grade level.

On February 6, 1989, Dr. Utgoff signed a new PBGC parking policy. Under the old policy, the following priority was accorded for executive parking spaces: Appointees at Executive Level V and above; full-time employees serving at the GS-16, 17, and 18 levels; principal secretary to the Executive Director; and GS-15 members of the Executive staff. *See* Stipulations of Fact at 4-5, ¶ 31. Under the new policy the following order of preference was adopted: Executive Director; the Deputy Executive Directors; Department Directors; and thereafter, preference would be based on grade

level. Additionally, the new policy reduced the price of an executive parking space from a monthly rate of $107.00 to $35.00 a month. When the new policy was adopted, Dr. Utgoff was sued by the union, which alleged that the adoption of the new parking policy was an unfair labor practice.

From the time he began working at PBGC in October, 1977, Mr. Faherty had an executive parking space at PBGC. Mr. Faherty lost his space when the new policy was adopted. In the past, there had been more executive spaces available than there were applicants for the parking spaces. With the drastically lowered price of parking spaces, several executives who had not previously parked at PBGC, requested a space for the first time, including Mr. De-Harde, who was Mr. Faherty's supervisor, and is over the age of 40, and Charles Skopic, also over the age of 40.

Mr. Faherty actually had use of an executive parking space during the months of March, July, and November, 1989, and from November, 1989, until at least the time of trial. In the other months, he parked in the non-executive spaces.

### The IRMD Position

Mr. Faherty's third count alleges that he was the victim of both age and sex discrimination when he was not selected for the GS-16 position of Director of Information Resources Management Operations Department.

Interestingly enough, Mr. Faherty's own expert witness, Glen Peterson, testified that he had reviewed the selection process for this position and found nothing improper about it.

Janet Barnes was hired as the GS-15 Director of Information Resources Management Department in September 1987 from outside the agency, after a competitive selection process which attracted approximately 300 applicants.[11] Mr. Vasquez was the selecting official for this position. Ms. Barnes, a female, was born on

11. Before she was hired at the PBGC, Ms. Barnes performed consulting services at the PBGC pursuant to a contract between her employer, Massie Information Systems, and the PBGC.

September 7, 1949. Mr. Faherty did not apply for this position. Throughout the relevant time period, Mr. Vasquez was Ms. Barnes' immediate supervisor.

After Ms. Barnes had worked at the agency for about a year, it was clear that she was performing duties beyond those identified in the position description for her job. After a discussion between Mr. Vasquez and Ms. Barnes, Mr. Vasquez asked Ms. Barnes to draft suggested language for a revised position description that encompassed the additional duties she was performing.

When Ms. Barnes made the suggested changes, Mr. Vasquez initiated the process for upgrading the position to a GS–16. The position description was submitted to the Personnel Department for review by a classification specialist, and was approved by the Personnel Department. Since the position was approved for an upgrade, the Personnel Office indicated that it had to be filled through a competitive selection.

The PBGC advertised the GS–16 IRMD position in a vacancy announcement, and received 12 applications, including that of Ms. Barnes and Mr. Faherty. All 12 applications were certified to Mr. Vasquez, who was the selecting official. At Mr. Tobin's suggestion, Dr. Utgoff chose to exercise her discretion to waive a PBGC directive that would have required convening a ranking and rating panel, given that only 12 applications had been received.[12] Mr. Tobin, called by defendant as both a factual witness and an expert witness, testified that this waiver was within Dr. Utgoff's authority, and that it enabled the selecting official to interview all 12 candidates. According to Mr. Tobin, it was a waste of time to convene a panel to choose from three to ten applicants as the most qualified out of a field of 12.

Mr. Vasquez rated each applicant based on the rating plan that had been developed by the Personnel Department, and interviewed each candidate. *See* Rating Plan at Plaintiff's Exhibit 54. Using the rating plan during his interview of each of the candidates, Mr. Vasquez gave Ms. Barnes a

total score of 89. He gave a total score of 46 to Mr. Faherty. Plaintiff's Exhibit 63. Two people received the top score of 89: Janet Barnes and an outside applicant named Richard Jenkins. Mr. Faherty received the 8th highest score, out of the group of 12 applicants. On March 30, 1989, Mr. Vasquez selected Janet Barnes for the upgraded Director of IRMD position. At the time, Ms. Barnes was 39 years of age.

## II. CONCLUSIONS OF LAW

■ Mr. Faherty established a *prima facie* case of age discrimination for all of his claims. He belonged to the statutorily protected age group, he was qualified for both the position of DED and the director of IRMD, he was not selected for either position, and both Mr. Vasquez (in the DED selection) and Ms. Barnes (in the IRMD position) were outside the protected class. *Krodel v. Young*, 748 F.2d 701, 706 (D.C. Cir.1984). Likewise, Mr. Faherty established a *prima facie* case of age discrimination for his second claim regarding the parking space.

Mr. Faherty established a *prima facie* case of sex discrimination when his parking privileges were revoked, and established a prima facie case of sex discrimination for his non-selection for the IRMD position.

### A. DED Position

The agency's legitimate, nondiscriminatory reason for its non-selection of Mr. Faherty was that Dr. Utgoff, in her discretion, believed that Mr. Vasquez was a better person for the job, given the problems faced by the PBGC at that time.

Dr. Utgoff testified regarding her perception of the needs of the agency with regard to the DED position: someone to work on the pressing issues of the budget and computer systems. She wanted internal affairs at PBGC to be managed smoothly while she was busy outside of PBGC working on legislative initiatives on the agency's budget and premium structure. Mr. Vasquez fit these needs. The selecting

---

12. Ordinarily, if over 11 applications are received, a panel is convened.

official was entitled to select anyone from the list of eligibles certified by the panel.

At this point, the "ultimate question" is whether Mr. Faherty demonstrated that the defendants' proffered reason was merely a pretext for age discrimination. In meeting this burden, Mr. Faherty had to prove by a preponderance of the evidence that "age made a difference" in Dr. Utgoff's decision not to select him. *Krodel*, 748 F.2d at 706. Mr. Faherty would prevail if he demonstrated that the reason offered by the defendant for his non-selection was a sham, and by offering additional circumstantial evidence of age discrimination. *Id.* There is no requirement that Mr. Faherty provide particularized evidence of actual age discrimination in the DED employment decision to meet his burden. *Id.*

The Court finds that Mr. Faherty did not prove that the reason offered by the defendant was a sham or that other circumstantial evidence showed age discrimination. The Court finds that Mr. Faherty did not discredit Dr. Utgoff's legitimate, non-discriminatory reason for her non-selection of Mr. Faherty. There is no evidence, direct or indirect, that age was a determining factor in Dr. Utgoff's decision to select Mr. Vasquez instead of Mr. Faherty. On the basis of all the evidence, the Court credits the defendant's version of events and its motivations for the employment decisions challenged in this action.

The evidence was overwhelming that Dr. Utgoff was impressed by Mr. Vasquez's stellar performance at OMB, the awards he had received, and his broad-based experience dealing with computers and budget issues. He had supervised employees in the past, and appeared to be someone who would have few problems adjusting to supervising larger numbers of people than he had supervised in his past employment. The rating panel obviously also thought highly of Mr. Vasquez's credentials—he received the highest average score of the three top applicants.

Mr. Vasquez made his recommendations to change the position description during the time that efforts were made to obtain a political appointment to the PBGC. No one at PBGC anticipated that the position was going to be competed. There is no law or regulation that prohibited Mr. Vasquez from commenting on a draft position description that might form the basis for a political appointment.

As evidence that the selection process was a sham and pretext for age discrimination, Mr. Faherty argued that the quality ranking factors were skewed toward Mr. Vasquez. Mr. Glen Peterson, plaintiff's expert witness in personnel matters and job analysis, testified that the vacancy announcement should have listed the duties on the position description in accordance with the importance of the duties that are performed. He further testified that this practice was not followed in the present action, since Duty 3, referring to information resources management, was listed on the third page of the position description, after duties that he believed were more significant. Mr. Tobin, called both as a fact witness and an expert witness on personnel matters, testified that there was no regulation or any requirement that duties on a position description be listed in any certain order. He testified that this was largely a matter of style, and that he felt it was unnecessary to edit a position description on this basis, as long as the position description accurately reflected the job duties of the vacant position. Mr. Peterson testified that when an agency head decides to create a supergrade position, it is in her absolute discretion to define the position as she sees fit. He also testified that Dr. Utgoff was not required to interview any of the candidates certified by the panel, and that she could have selected anyone certified to her by the panel. Further, Mr. Peterson testified that there is no obligation to compete an interagency detail position.

Defendant's expert, Ann Ugelow, currently serves as an agency officer at the Office of Personnel Management (OPM) in the Office of the Executive Personnel, Operations Division. During her tenure at OPM, Ms. Ugelow led a project which wrote much of the material on FPM Supplement 305–1, which is the definitive guid-

ance on the supergrade selection process. Ms. Ugelow was primarily responsible for the chapter on staffing. This manual was applicable to the selections at issue in this case. Ms. Ugelow testified that she reviewed the selection of Joseph Vasquez and found that it conformed with the requirements of the law and regulations. Ms. Ugelow further testified that there is no regulation addressing the order in which duties are to be listed in a position description. Given the substantial experience of Ms. Ugelow in the regulations which applied to the selections at issue in this case, the Court credits Ms. Ugelow's review of the DED selection.

Given that there are no regulations addressing the order in which duties should be listed on a position description, the Court will not take it upon itself to impose any such regulation. Nor does the Court find that the order in which the duties were listed in this case is evidence of discriminatory conduct on the part of the selecting officials for the DED position. There was no persuasive evidence presented to the Court that the way in which the position description or ranking factors were developed was to give Mr. Vasquez an advantage in the selection process. The position description, and the quality ranking factors bore a rational relationship to the job responsibilities of the newly created position of career DED.

Mr. Faherty points to the fact that in a list of contacts for the Bureau of Labor Statistics Productivity Measurements, Mr. Dellinger's name was deleted as the contact, and Mr. Vasquez's name was substituted, without adding the word "acting" to the title of DED. See Amended Complaint at ¶ 25. This, Mr. Faherty contends, is evidence that Mr. Vasquez believed that he would be permanently appointed to the Deputy Executive Director position, even before the position had been competed. See Plaintiff's Exhibit 9. The Court is unpersuaded by plaintiff's argument. The document provides no persuasive evidence of pre-selection or age discrimination. Essentially, the document is a phone and address list. The list appears to serve purely an administrative function: to update the

Bureau of Labor Statistics as to who is the proper person to contact at PBGC, and give the proper phone number and address. The list was attached to a memorandum that properly identified Mr. Vasquez as the "Acting" DED. Given the multitude of memoranda, letters, and other documents signed by Mr. Vasquez during his tenure as Acting DED, the absence of the title "acting" from this one document—a rough phone list—hardly amounts to evidence that Mr. Vaquez had been pre-selected for the DED position.

Mr. Faherty contends that Mr. Vasquez obtained an unfair advantage over Mr. Faherty in the competition for the DED position because of his attendance at the SMIP meeting. Mr. Faherty asserts that Mr. Vasquez was provided with an opportunity to comment on Mr. Faherty's performance rating and amount of award, while Mr. Faherty was a competitor for a permanent position. No one who attended the meeting recalled Mr. Vasquez making a single comment on the performance of Mr. Faherty. Indeed, the evidence points to the conclusion that Mr. Vasquez was not a primary participant in the stage of the meeting during which SMIP awards were discussed.

The Court finds that Mr. Vasquez was not pre-selected for the career DED position and that age was not a determining factor in the non-selection of Mr. Faherty for the career DED position.

### B.  Parking Policy

■ In a retaliation claim, to prove a *prima facie* case of retaliation, a plaintiff must show that he engaged in a statutorily protected activity (participating in the EEO process), that the employer took an adverse employment action, and that there was a causal connection between the two. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C.Cir. 1985), citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984) (footnote omitted). The causal connection component of the *prima facie* case may be established if the plaintiff shows that the employer had knowledge of the employee's protected activity, and that the adverse personnel ac-

tion took place shortly after the activity. *Mitchell,* 759 F.2d at 86.

Mr. Faherty made out a *prima facie* case of reprisal. He was engaged in a statutorily protected activity. He was engaged in pursuing his age discrimination claim with the EEOC for his non-selection for the DED position. Mr. Faherty filed his Notice of Intent to file a civil action under the ADEA with the EEOC on November 6, 1987. His involvement with his ADEA claim continued through the time of this trial. The defendant had notice of Mr. Faherty's pursuit of his ADEA claim. The parking policy was adopted on February 6, 1989.[13] Mr. Faherty lost a parking place when the parking policy was adopted.

▆ Mr. Faherty asserted in his amended complaint that "[t]he new executive parking allocation was intentionally designed by responsible officials in the agency's Office of Executive Director to eliminate the plaintiff's parking space in retaliation for the plaintiff's prior participation in the EEO process, including the filing of a statutory Notice of Intent, on November 6, 1987, to file a civil action against the PBGC under the ADEA." Amended Complaint at ¶ 49. Mr. Faherty further alleged that the change in the parking policy discriminated against him on the basis of his sex and age "because the revised standards for awarding parking spaces provided preferential treatment to Janet Barnes," who was a GM–15 female employee under the age of 40.

Ms. Barnes had use of an executive parking space as the Director of IRMD in the fall of 1987, long before the new policy went into effect. When the parking policy was changed, she continued to have parking privileges based on her position as director of IRMD. Mr. Faherty was not a director of any department at PBGC, consequently he was not accorded priority under the new policy. He was not the only employee who was left without a space when the new policy was adopted. Several older,

male employees benefited from the change in the parking policy, including Mr. Faherty's own supervisor, who was older than Mr. Faherty. There was absolutely no evidence presented to the Court that age, sex, or retaliation played any role in the adoption of the new policy. Mr. Geiger, the person who conducted the investigation into other agency parking policies, and a male over the age of 40, was not involved in any of the personnel actions challenged by Mr. Faherty. While Mr. Geiger was supervised by Mr. Vasquez, and the parking policy had to be approved by Dr. Utgoff, there was no evidence that they attempted to influence his work. Further, the Court can find no basis for the conclusion that Dr. Utgoff, the head of a busy federal agency responsible for hundreds of millions of dollars, and her deputy, Mr. Vasquez, with numerous responsibilities, would purposefully choose a particular parking policy to retaliate against a single employee, or as an outlet for age or sex discrimination.

The evidence shows that Mr. Faherty now has an executive parking space, and had use of one sporadically during the relevant time period. Thus, Mr. Faherty has been one of the beneficiaries of the new policy, particularly given the drastically reduced price.

### C. IRMD Position

▆ The defendant's articulated legitimate, non-discriminatory reason for selecting Ms. Barnes over Mr. Faherty for the IRMD position was that Ms. Barnes was more qualified for the job than Mr. Faherty. Ms. Barnes was the incumbent in the position that formed the basis for the upgraded position, and had substantial experience in handling the job duties already. There is no indication that the job position description was drafted to the detriment of Mr. Faherty. The situation was not an uncommon one: Ms. Barnes, in her GS–15 position, was taking on increasing job re-

**13.** The Court notes that efforts had been made to investigate the parking policy and those of other agencies before Mr. Faherty notified the agency of his intent to pursue his age discrimination claim. The particular policy ultimately adopted was adopted after Mr. Faherty had notified the agency of his intent to sue. However, the evidence shows that some kind of change in the parking policy was likely to be made once the investigation was completed.

sponsibilities to such an extent that the Personnel Office believed that her position would be appropriate for an upgrade. The Personnel Office, in seeking to comply with all regulations, notified her supervisor that the upgrade would require competing the position. All evidence points to the fact that the redrafting of the position description, the rating form, and the decision not to convene a rating panel given the small number of applicants were handled properly within personnel regulations.

Mr. Peterson, the plaintiff's own expert, testified that he reviewed the selection for the IRMD Position and had found nothing improper about it. In his opinion, the quality ranking factors and the rating were accurately and validly described, and the criteria were related to the duties of the IRMD Director.

Mr. Vasquez, as the selecting official, properly interviewed all 12 applicants. Ms. Barnes received the highest score, along with another applicant from outside the agency. Mr. Faherty received the 8th highest score.

The Court finds that there is no basis for Mr. Faherty's claim that he was denied the IRMD position as a result of age discrimination, sex discrimination or based on reprisal for his pursuit of his ADEA claim.

### D. Pattern and Practice of Discrimination

Mr. Faherty produced little evidence in support of his claims of a pattern and practice of discrimination at PBGC. No statistical expert was called, nor did he offer any other statistical evidence to support his claim. Instead, he put on a series of four witnesses, who gave anecdotal testimony on ways in which they felt they had been mistreated by Dr. Utgoff during their tenure at PBGC. The intended implication was that the perceived mistreatment by Dr. Utgoff was based on age discrimination.

The Court does not credit any of the allegations of age discrimination of the plaintiff, nor of any of the four witnesses, Roderick O'Neill, Richard Conroy, Jeannette Dyson, and Jesse Paredes. None of these witnesses ever filed a timely EEO complaint alleging that he or she had been the victim of discrimination. Further, the defendant persuasively demonstrated that just as Dr. Utgoff had asked for the resignations of several employees over the age of 40, she had terminated employees who were under the age of 40 who were not satisfactory.[14] The Court notes that the evidence shows that one of the most highly praised employees at PBGC was Mr. Faherty's supervisor, Mr. DeHarde—a male over the age of 40, and older than Mr. Faherty.

### CONCLUSION

In sum, the facts as presented to the Court paint a picture of an organization going through the painful process of a reorganization. A new director was on board who made decisions that changed the way in which the agency operated. Her decisions were met with some resistance. Perhaps she did not handle the transition with as much attention to the concerns of career employees as might have been hoped, as is the case with many political appointees. However, there is no indication that age, gender, or retaliation played *any* part in any of the challenged decisions or actions in this case. The ADEA and Title VII simply are not vehicles for righting all employment disagreements. Throughout this case, Mr. Faherty was unable to connect any of the personnel decisions to age, gender or retaliation.

For the foregoing reasons, the Court shall grant judgment to the defendant.

14. The Court also notes that the plaintiff, in an attempt to buttress his pattern and practice claim, lumped together diverse groups of employees and presented them for comparison. The Court rejects plaintiff's proffer. Mr. O'Neill, for example, was a non-career political appointee, who admitted that he served at the pleasure of the Executive Director. There is no basis for his implication that he was terminated on the basis of his age. The record is clear that he was terminated because he lacked loyalty to Dr. Utgoff, and demonstrated remarkable insensitivity to both women and people of the Jewish faith through his sexist and anti-semitic comments.